**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-cv-23927- BLOOM/Elfenbein**

Kelly M. Crawford, as Receiver of
TRADERS DOMAIN FX LTD. d/b/a,
TRADERS DOMAIN, *et al.*,

Plaintiff,

v.

CHRISTOPHER ISAAC BROWN,
JOSEPH BROOKS CARTER, TOMER
DANIEL, FRANK ANTHONY DICRISI III,
DAN FLEYSHMAN, AMIT FRIDMAN,
JULIAN KUSCHNER, BENJAMIN
MULLER, MARCO RUIZ OCHOA,
THOMAS THEN, and CHAD THYZEL,

Defendants.
_______________________________________/

## AMENDED COMPLAINT

Kelly M. Crawford, in his capacity as the Court-appointed Receiver and assignee for, among other individuals and entities, Traders Domain FX, Ltd., Algo Capital LLC, SAEG Capital Ltd., SECAP Holdings, LLC, and SACAP Holdings, Inc. (the "Receiver"), files this Amended Complaint against the Defendants listed below, and states:

## PROCEDURAL HISTORY

1. On September 30, 2024, the CFTC filed a Complaint for Injunctive Relief and Demand for Jury Trial (the "Complaint") against Traders Domain FX Ltd. d/b/a/ The Traders Domain ("Traders Domain"); Ares Global Ltd. d/b/a/ Trubluefx; Fredirick Teddy Joseph Safranko a/k/a Ted Safranko; David William Negus-Romvari; Algo Capital LLC ("Algo"); Algo FX Capital Advisor, LLC, n/k/a Quant5 Advisor, LLC; Robert Collazo, Jr.; Juan Herman a/k/a JJ Herman; John Fortini; Steven Likos; Michael Shannon Sims; Holton Buggs, Jr.; Centurion Capital Group,

Inc. ("Centurion Capital"); Alejandro Santiesteban a/k/a Alex Santi; Gabriel Beltran; and Archie Rice (collectively, the "Receivership Defendants"), commencing the above-captioned enforcement action (the "CFTC Action"). CFTC Action at ECF No. 1.

2. On October 3, 2024, the Court entered an Order granting the CFTC's Motion for Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief (the "SRO"). CFTC Action at ECF No. 10. The SRO was continued in effect pursuant to preliminary injunctions entered as to each of the Defendants (collectively, the "PI Orders"). CFTC Action at ECF Nos. 38, 40, 41, 42, 48, 49, 53, 131, 144, 158.

3. On March 13, 2026, the Court entered an order expanding the receivership to include Block Consulting Services, LLC ("Block Consulting"), MAS Capital Investments, LLC ("MAS Capital"), Alpha Trader Firm, LLC ("Alpha Trader"), Profit Over Everything, Inc. ("POE"), Centurion TS Holdings, LLC ("Centurion TS"), GMJ Marketing, LLC ("GMJ Marketing"), Go Long Investments, LLC ("Go Long"), The Nutrition Zone, LLC ("Nutrition Zone"), Intelligenza, LLC ("Intelligenza"), and JVL Fortini Consulting, LLC ("JVL Consulting") (the "Expansion Order"). *See* CFTC Action at ECF No. 425.

4. The SRO, PI Orders, and Expansion Order, are collectively referred to as the "Appointment Orders."

5. The Receiver was also previously appointed as receiver in a related enforcement action arising in the U.S. District Court for the Southern District of Texas, styled *Commodity Futures Trading Commission v. Marcus Todd Brisco, et al.*, Case No. 4:23-cv-0036 (the "Texas Action"). The defendants in the Texas Action included, among other individuals and entities, Tin Quoc Tran.

6. On March 30, 2026, the Court in the Texas Action entered an order finding: (i) that certain entities owned and controlled by Tran were included within receivership, including MTT9 Investments, LLC ("MTT9"), SAEG Capital Ltd. ("SAEG"), SECAP Holdings, LLC ("SECAP"), and SACAP Holdings, Inc. ("SACAP"), (ii) that the assets of such entities were subject to the SRO in the Texas Action, and (iii) that the Receiver, in his capacity as receiver in the Texas Action, was authorized to execute an assignment of his interests in MTT9, SAEG, SECAP and SACAP to the CFTC Action Receiver. *See* Texas Action at ECF No. 230.

7. The Receiver assigned his interests in MTT9, SAEG, SECAP, and SACAP, including without limitation, the ability to pursue all claims or causes of action held by or against MTT9, SAEG, SECAP, and SACAP to the receivership in the CFTC Action (the "Assignment"). *See* **Exhibit A** at p. 2.

8. Traders Domain, Algo, Centurion Capital, Block Consulting, MAS Capital, Alpha Trader, POE, Centurion TS, GMJ Marketing, Go Long, Nutrition Zone, Intelligenza, JVL Consulting, MTT9, SAEG, SECAP, and SACAP are collectively hereinafter referred to as the "Receivership Entities."

9. The Receiver's mandate under the Appointment Orders was to, *inter alia*, take possession, custody and control of all the Receivership Entities' assets, establish control of the Receivership Entities' businesses (to the extent they exist and continue to operate), prevent the withdrawal or misapplication of the Receivership Entities' funds, collect funds due to the Receivership Entities, obtain documents and records pertaining to the Receivership Entities' assets, transactions and business operations, and perform all acts necessary to preserve the value of the Receivership Estate. *See* SRO.

10. The Receiver was also authorized to initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings the Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate. *Id.* at ¶ 30(h).

**JURISDICTION AND VENUE**

11. This action is related to the claims in the CFTC Action, over which this Court has original jurisdiction pursuant to 28 U.S.C. Section 1331, in that this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to 28 U.S.C. § 1367(a). As such, this Court has subject matter jurisdiction over this action.

12. Plaintiff was appointed as Receiver in this District and the instant Complaint is brought to accomplish the objectives of the Appointment Orders.

13. When the Receiver was appointed in the CFTC Action, he opened numerous miscellaneous proceedings and filed Notices of Appointment of Receiver, including the CFTC Complaint and the SRO, in the following Districts: M.D. Ala (Case No. 2:24-mc-04033-RAH); N.D. Ala. (Case No. 2:24-mc-1403-RDP); S.D. Ala. (Case No. 24-mc-10-KD); D. Ariz. (Case No. 2:24-mc-00044-PHX); E.D. Ark. (Case No. 4:24-mc-00008-BSM); W.D. Ark. (Case No. 2:24-cm-66); C.D. Cal. (Case No. 2:24-mc-00128-UA); E.D. Cal. (Case No. 2:24-mc-00405-DJC); N.D. Cal. (Case No. 24-ms-80259); D. Del. (Case No. 24-516); M.D. Fla. (Case No. 2:24-mc-00012-JLB); N.D. Fla. (Case No. 1:24-mc-00170-AW); N.D. Ga. (Case No. 1:24-mi-00104-UNA); S.D. Ga. (Case No. 1:24-mc-00012-JRH); M.D. Ga. (Case No. 5:24-mc-00006); C.D. Ill. (Case No. 1:24-mc-01002-JES-JEH); N.D. Ill. (Case No. 1:24-cv-10293); S.D. Ill. (Case No. 3:24-mc-00066-NJR); E.D. La. (Case No. 24-2467); M.D. La. (Case No. 24-mc-140); W.D. La. (Case

No. 5:24-mc-00070); D. Md. (Case No. 1:24-mc-525); E.D. Mich. (Case No. 2:24-mc-51213-LJM); W.D. Mich. (Case No. 1:24-mc-00121-PJG); D. Nev. (Case No. 2:24-ms-00078); D.N.J. (Case No. 1:24-mc-00069-CPO); E.D.N.Y. (Case No. Misc24-4146); N.D.N.Y. (Case No. 1:24-mc-23); S.D.N.Y. (Case No. 1:24-mc-00477); W.D.N.Y. (Case No. 24-mc-35); E.D.N.C. (Case No. 5:24-mc-29-UA); M.D.N.C. (Case No. 1:24-mc-00022-UA); W.D.N.C. (Case No. 3:24-mc-00143-GCM); D. Or. (Case No. 3:24-mc-01039); E.D. Pa. (Case No. 2:24-mc-00058-UJ); M.D. Pa. (Case No. 3:CV-mc-0811); W.D. Pa. (Case No. 1:24-mc-00080-SPB); E.D. Tex. (Case No. 6:24-mc-00016); N.D. Tex. (Case No. 3:24-mc-0063-D); S.D. Tex. (Case No. 4:24-mc-01681); W.D. Tex. (Case No. 5:24-mc-1178); E.D. Wis. (Case No. 24-mc-42); W.D. Wis. (Case No. 3:24-mc-00007); D. Wyo. (Case No. 24-mc-250-S).

14. "Courts have long recognized a federal court's supplemental jurisdiction over actions related to a receivership established in federal court." *See Mandel v. Howard*, 2012 U.S. Dist. LEXIS 43948 (S.D. Fla. Mar. 28, 2012) (collecting cases). This Court has subject-matter jurisdiction over the state-law claims asserted in this complaint in this ancillary proceeding pursuant to 28 U.S.C. §§ 754 and 1367 because such claims are ancillary to the CFTC Action brought in the case captioned *CFTC v. Traders Domain FX Ltd. d/b/a, The Traders Domain, et al.*, Case No. 24-cv-23745-ALTMAN (S.D. Fla.), over which the court in the Southern District of Florida has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction extends from the Southern District of Florida to any judicial district where receivership property is found.

15. The Receiver was appointed in the CFTC Action to accomplish the ends sought and directed by that action, and, as such, he may proceed under this Court's ancillary jurisdiction on claims with no other independent basis for federal jurisdiction. The Receiver, in this action, sues Defendants, each of whom or which received money transfers from the subject fraudulent scheme,

which is a well-recognized use of the ancillary jurisdiction of the federal courts. *See e.g., Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (finding federal ancillary jurisdiction over state law fraudulent transfer claims in an action by a receiver against transferees in a Ponzi scheme case); *see also* 28 U.S.C. § 1331.

16. The Court also has personal jurisdiction over Defendants because Defendants conducted business with, and/or received funds or transfers of assets from the Receivership Entities, which were operating, conducting, engaging in, and carrying on a fraudulent business or business venture in, among other locations, the Southern District of Florida. The transfers that Defendants received from Receivership Entities were proceeds from Receivership Entities' fraudulent scheme conducted from the Southern District of Florida.

17. The Court also has personal jurisdiction over Defendants because they regularly conduct business in the state of Florida, solicited funds from the Receivership Entities in the state of Florida, and/or transacted business with the Receivership Entities in this District. In doing so, each Defendant purposefully directed its activities to the state and availed itself of the privileges of conducting activities in the state.

18. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 754 and 1692, because this action is brought to accomplish the objectives of the Appointment Orders and is ancillary to the Court's exclusive jurisdiction over the Receivership Estate. Further, acts described herein occurred in the Southern District of Florida, and some victims of the scheme were located in the Southern District of Florida.

19. All conditions precedent to the bringing of this action have been performed, waived, satisfied, or have otherwise occurred.

**RECEIVER'S STANDING**

20. The Receiver has standing to bring the claims asserted in this Complaint pursuant to the SRO. SRO at ¶ 30(h). The SRO authorizes and empowers the Receiver to:

> Initiate . . . or become a party to any actions or proceedings . . . that the Temporary Receiver deems necessary and advisable to preserve the value of the Receivership or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order

*Id*. Included among such actions are fraudulent transfer and unjust enrichment actions to recover for the benefit of the Estate amounts that the Receivership Entities fraudulently transferred to and/or unjustly enriched third parties.

21. The Receiver as a "creditor," and on behalf of the "creditors," of the Receivership Entities, has standing to bring the fraudulent transfer claims asserted in this Complaint under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), section 726.101, Florida Statutes *et seq*. and common law unjust enrichment (pled in the alternative to the fraudulent transfer claims).

22. The Receiver also has standing to bring the fraudulent transfer and unjust enrichment claims on behalf of the Receivership Entities as a creditor of pre-receivership Receivership Entities seeking to redress the wrongs committed to the Receivership Entities by its management in making the fraudulent transfers and unjust payments to and for the benefit of Defendants. *See Wiand v. Lee*, 753 F. 3d 1194, 1202 (11th Cir. 2014).

23. Finally, the Receiver has standing to bring this action pursuant to 28 U.S.C. § 754, which provides that "[a] receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall . . . be vested with complete jurisdiction and control of all such property with the right to take possession thereof [and] shall have capacity

to sue in any district without ancillary appointment[.]" As set forth above, the Receiver has complied with the requirements set forth in 28 U.S.C. §§ 754 and 1692.

## LIMITATIONS PERIOD AND APPLICABLE LAW

24. This action is brought within the pertinent statutory limitations period. Section 726.110, Florida Statutes provides a four-year period to seek to avoid and recover transfers from the date the transfer was made or, if later, within one year after the transfer was or could reasonably have been discovered by the claimant.

25. Upon his appointment on October 3, 2024, the Receiver immediately began collecting financial documents including bank statements, wire transfer details, cancelled checks and business records for the Receivership Entities. Many of the documents were obtained by subpoena from the Receivership Entities' various banks. The Receiver then promptly forwarded those documents to his forensic accountants who conducted a forensic accounting analysis of the transfers that the Receivership Entities made to third parties. The Receiver obtained and reviewed those analyses and gained knowledge of Receivership Entities' transfers to third parties therefrom.

26. Further, the Receiver was first appointed as receiver over Block Consulting, MAS Capital, Alpha Trader, POE, Centurion TS, GMJ Marketing, Go Long, Nutrition Zone, Intelligenza, and JVL Consulting, on March 13, 2026.

27. And, the Receiver was first appointed as receiver over MTT9, SAEG, SECAP, and SACAP on March 30, 2026.

28. The Receiver did not and could not have discovered the facts constituting the Receivership Entities' misconduct and the fiat transfers detailed below until after his initial appointment as Receiver on October 3, 2024 and/or until after his appointment as Receiver over SAEG, SECAP, and SACAP on March 13, 2026.

29. As to the cryptocurrency transfers detailed below, the Receiver could not have discovered the subject cryptocurrency transfers on the date of his initial appointment, because the cryptocurrency records containing the subject transfers were not in the Receiver's possession at that time. After being appointed, the Receiver's investigation indicated that many of the receivership defendants, including Traders Domain FX Ltd., may have perpetrated the Ponzi scheme using cryptocurrency. Because of the inherent complexity and privacy of cryptocurrency transactions, the identity of transferors and transferees were concealed. Accordingly, to investigate whether Traders Domain engaged in any cryptocurrency transactions, the Receiver began issuing subpoenas to various cryptocurrency exchanges beginning in June 2025. Further, the Receiver engaged a forensic cryptocurrency expert to conduct a forensic tracing of cryptocurrency transfers related to Traders Domain. The Receiver also engaged in discussions with B2Broker, an offshore cryptocurrency company, in an effort to determine if Traders Domain maintained cryptocurrency accounts with that entity.

30. The Receiver first received records related to potential Traders Domain cryptocurrency account records from B2Broker on or after July 16, 2025 and determined that Traders Domain maintained crypto accounts with B2Broker, including each of the transferor wallet addresses identified in the crypto transfer summaries attached as **Exhibits B** through **H**, and **Exhibits J** through **K**, and **Exhibits M** through **N**.

31. And, once the Receiver was in possession of Traders Domain's B2Broker records, it was still not possible to discover the subject cryptocurrency transfers. For example, a review of the Traders Domain B2Broker records reflected many transfers out to, and in from, various cryptocurrency wallet addresses with no identifiable ownership information. To determine the identity of the owners of the various cryptocurrency wallet addresses which received transfers

from the Traders Domain cryptocurrency wallets, the Receiver had to issue subpoenas to various cryptocurrency exchanges, including Coinbase. On August 8, 2025, Coinbase provided the Receiver with records and the Receiver's cryptocurrency consultant began conducting a forensic tracing of the cryptocurrency transfers from Traders Domain to the Defendants.

32. The Receiver's cryptocurrency consultant, after reviewing the Coinbase records was able to perform an analysis which reflected certain Defendants' ownership over cryptocurrency wallet addresses which received the cryptocurrency transfers which are now at issue in this case.

33. As such, the Receiver's actual fraudulent transfer claims under section 726.105(1)(a), Florida Statutes are timely, as this action was filed within one year from the date on which the subject transfers could reasonably have been discovered by the Receiver.

34. The Receiver also seeks to avoid and recover constructive fraudulent transfers under sections 726.105(1)(b) and 726.106, Florida Statutes, which were made to Defendants within the four-year period prior to the date upon which the Receiver filed this Complaint.

35. The Receiver also seeks damages for unjust enrichment under Florida common law for the transfers made to Defendants.

## FACTUAL ALLEGATIONS

### The Traders Domain Fraudulent Scheme

36. Traders Domain FX Ltd. d/b/a The Traders Domain is a company with its principal operations in Canada. Fredirick Teddy Joseph Safranko a/ka Ted Safranko and David William Negus-Romvari were the control persons of Traders Domain.

37. From at least November 2019 to October 2024 (the "Relevant Period"), Traders Domain fraudulently solicited at least 2,046 U.S. customers to deposit at least $283 million for the

purpose of pooled trading of leveraged or margined gold-to-U.S. dollar pair ("XAU/USD") transactions (the "TD Pool").

38. Traders Domain solicited customers directly and by engaging other individuals and entities ("Sponsors") to solicit customers on its behalf in exchange for commissions equivalent to a percentage, sometimes as high as 50%, of customers' purported trading profits.

39. During the relevant period, Traders Domain made false statements and fraudulent misrepresentations to prospective customers regarding its trading operations and the ability of customers to withdraw their funds. Traders Domain misled customers into believing that all their deposited funds were being invested in XAU/USD when in fact customer funds were being misappropriated and used for other purposes.

40. To conceal their fraud, Traders Domain falsified trading records by manipulating customer trading data such that the daily trading results snapshots sent to customers were nearly always positive. Traders Domain also manipulated trading data to eliminate purported trading losses. And, when customers observed trading losses in their accounts and raised their concerns, Traders Domain falsely claimed (directly or through Sponsors) that such losses were "system errors" or the result of "slippage."

41. When Traders Domain began experiencing "liquidity problems" in August 2022, Traders Domain lied to customers about the purported reasons for delayed withdrawals and made false assurances that withdrawals would eventually be processed. Indeed, Traders Domain lacked the funds to repay its customers because such funds had been misappropriated and not traded as purported, and the Traders Domain fraudulent scheme was on the brink of collapse.

42. Traders Domain misappropriated customer funds by directing customers to deposit funds into third-party bank accounts which were not controlled by Traders Domain or to payment

processors contracted by Traders Domain who acted at the direction of Traders Domain. Traders Domain also failed to use at least some customer funds to trade XAU/USD and charged commissions on purported trading profits that did not exist. Traders Domain also misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts.

43. Traders Domain also misappropriated customer funds by using new customer deposits to make Ponzi-style payments to fund pending withdrawals for certain customers.

44. As detailed above, Traders Domain extensively relied on cryptocurrency payments to perpetuate its Ponzi scheme. Traders Domain accepted cryptocurrency deposits and made cryptocurrency transfers through numerous cryptocurrency wallets which were, at all relevant times, owned and controlled by Traders Domain. Each of the transferor cryptocurrency wallet addresses outlined in the crypto transfer summaries attached as **Exhibits B** through **H**, and **Exhibits J** through **K**, and **Exhibits M** through **N**, were, at all relevant times, owned and controlled by Traders Domain.

## The Sponsor Fraudulent Schemes

### Algo Capital

45. Algo Capital, LLC ("Algo") and Algo FX Capital Advisor, LLC n/k/a Quant5 Advisor, LLC ("Algo FX") operated from their principal places of business in Miami, Florida.

46. Robert Collazo, Jr. was the President of Algo and manager and owner of Algo FX. Juan "JJ" Herman was the Vice President of Algo and a manager and owner of Algo FX. At all material times, Collazo and Herman were controlling persons of Algo and Algo FX.

47. At all material times, Collazo additionally owned and controlled Block Consulting, and Herman owned and controlled Intelligenza and Nutrition Zone, all of which operated from principal places of business in Miami, Florida.

48. John Fortini was the Vice President and CFO Portfolio Management of Algo and Algo FX. Fortini additionally owned and controlled JVL Consulting, which operated from a principal place of business in Miami, Florida.

49. From at least November 2019 to October 2024 (the "Relevant Algo Period"),[1] the Algo stakeholders made false and misleading statements to current and prospective customers regarding Algo's trading operations, how customer funds were being utilized, and where customer funds were located. And, Algo stakeholders misappropriated and commingled customer funds.

50. Algo was a Traders Domain Sponsor and fraudulently solicited at least $39 million from at least 242 customers for the purposes of trading leveraged or margined XAU/USD by making material misrepresentations and omissions to prospective and actual investors.

51. During the Relevant Algo Period, Algo stakeholders executed agreements with customers providing licenses to use Algo's "proprietary algorithmic trading software" in exchange for up to 50% of customer trading profits; however, Algo was operating as a fraudulent scheme, and Algo stopped using its own proprietary algorithm and directed customer funds to Traders Domain.

52. And, in some instances, instead of sending customer funds to Traders Domain, they directed customers to deposit funds into bank accounts controlled by Collazo and Herman using certain of the funds for personal and non-trading related purposes.

53. Algo stakeholders fraudulently misled customers into believing that Algo had control of their funds when, in some instances, Traders Domain did. Algo customers were directed to submit withdrawal requests directly to Algo, and Algo, in turn, submitted withdrawal requests

[1] While the CFTC's Complaint concerns the period of October 2021 through October 2024, the Receiver's investigation reflects that Algo was operating as a Ponzi scheme and/or other fraudulent scheme from as early as November 2019.

to Traders Domain without copying or notifying its customers. Traders Domain failed to return funds, and by January 2023, the backlog of outstanding Algo customer withdrawal requests amounted to approximately $27 million.

54. During the Relevant Algo Period, Algo customers deposited no less than $32 million into the accounts controlled by Collazo and Herman, but most customer withdrawals could not be paid because Algo, Collazo, and Herman used most of the funds to pay themselves and to make Ponzi-style payments to certain customers.

The Centurion and Santi Fraudulent Scheme

55. Centurion Capital Group, Inc. ("Centurion Capital") operated from a principal place of business in Hialeah Gardens, Florida.

56. Alejandro Santiesteban a/k/a Alex Santi owns Centurion Holdings, LLC, which is the designated President of Centurion Capital. Gabriel Beltran owns GMJ Marketing, LLC, which is the designated Vice President of Centurion Capital. At all material times, Santi and Beltran were owners and controlling persons of Centurion Capital.

57. Archie Rice was a representative of Centurion Capital and solicited customers on behalf of Centurion Capital. At all material times, Rice owned and controlled Go Long Investments, LLC.

58. At all material times, Santi additionally owned and controlled Alpha Trader Firm, LLC ("Alpha Trader"), Centurion TS Holdings, LLC ("Centurion TS"), and Profit Over Everything, Inc. ("POE"), all of which operated from a principal place of business in Miami, Florida. Alpha Trader, Centurion TS, POE, and Centurion Capital are collectively hereinafter referred to as the "Centurion Entities."

59. From at least March 2022 to October 2024, Centurion Capital was a Traders Domain Sponsor and fraudulently solicited at least $8.4 million from at least 47 customers for the

purported purposes of trading leveraged or margined XAU/USD by making material misrepresentations and omissions to prospective and actual customers.

60. Santi and/or the Centurion Entities fraudulently solicited customers by making false and misleading statements to prospective customers regarding Centurion's trading operations, alleged profits, how customer funds were being utilized, and where customer funds were located.

61. Santi and/or the Centurion Entities misled customers into believing that Centurion Capital Group's "Hedge Fund" controlled customer funds but, rather than holding such funds in a Centurion Capital Group account as they represented, Centurion Capital Group used the funds for their own purposes and/or to participate in the TD Pool, which itself was a Ponzi scheme.

62. Santi and/or the Centurion Entities frequently made misrepresentations and false assurances to customers about their ability to withdraw their funds. No later than August 2022, Santi and/or the Centurion Entities learned that Traders Domain would not be able to process withdrawal requests, but he chose not to share this information with current customers along with new customers they solicited after such time.

63. Santi and/or the Centurion Entities also misappropriated and commingled customer funds by accepting funds in accounts controlled by them, including accounts of the Centurion Entities, and using such funds to pay themselves and make Ponzi-style payments to certain customers.

64. As a result of the fraudulent conduct outlined above, the CFTC commenced the CFTC Action against, among other individuals and entities, Santi and Centurion Capital Group, which resulted in the entry of a preliminary finding that Santi and Centurion Capital Group likely participated in a fraudulent commodities scheme. *See* SRO.

65. As a result of operating a Ponzi scheme, Santi and/or the Centurion Entities were insolvent. At all relevant times, Santi and/or the Centurion Entities did not have sufficient assets to pay debts owed to customers and creditors as those debts became due.

Michael Sims

66. Michael Shannon Sims is a Florida resident who owns and operates numerous companies related to investing and trading, including MAS Capital.

67. From at least September 2021 to October 2024 (the "Relevant Sims Period"), Sims was a Traders Domain Sponsor and fraudulently solicited at least $22 million from at least 42 customers for the purposes of trading leveraged or margined XAU/USD by making material misrepresentations and omissions to prospective and actual customers.

68. During the Relevant Sims Period, Sims falsely claimed to prospective and current customers that he was collecting money for his "hedge fund." Sims claimed that his hedge fund had been in operation for over 10 years and employed a team of experienced traders to trade on behalf of customers; however, no such hedge fund ever existed, and Sims was in fact recruiting customers for the TD Pool.

69. Sims made false and misleading statements to current and prospective customers regarding the profit and risk associated with trading, the structure of the trading operation, and the ability of customers to withdraw funds. To entice prospective customers, Sims falsely claimed that his nonexistent hedge fund was profitable every month and generated profits up to 40%.

70. Sims made misrepresentations and false assurances to customers regarding their ability to withdraw their funds. When customers inquired regarding withdrawal requests that were pending for months, Sims falsely assured customers that the withdrawals would be processed.

71. Sims knew or should have known that Traders Domain was engaged in illegal and/or fraudulent activity, but he ignored all such indications and failed to disclose such information to current and prospective customers.

72. Sims misappropriated customer funds by taking 40-50% commissions on false trading profits. Sims also directed customers to deposit funds into accounts controlled by third-party entities, including MAS Capital, to be used for purposes not disclosed to or agreed to by the investors.

73. As a result of the fraudulent conduct outlined above, the CFTC commenced the CFTC Action against, among other individuals and entities, Collazo, Sims, and Algo, which resulted in the entry of preliminary findings that Collazo, Sims, and Algo likely participated in a fraudulent commodities scheme. *See* SRO.

74. As a result of operating a Ponzi scheme, the Receivership Entities were insolvent, undercapitalized, and operating at a loss. During all relevant times, the Receivership Entities did not have sufficient assets to pay their debts to customers and creditors as those debts became due.

<u>The Involvement of MTT9, SAEG, SECAP, and SACAP in the TD Scheme</u>

75. The Traders Domain fraudulent scheme was facilitated by various non-Sponsor third-party entities that were organized and controlled by Tin Quoc Tran, including, among other entities, MTT9, SAEG, SECAP, and SACAP.

76. Traders Domain customers were directed to deposit funds into the MTT9, SAEG, SECAP, and SACAP bank accounts, which were owned and controlled by Tran (the "Tran Bank Accounts"), for purposes of investing into the TD Pool.

77. During the Relevant Period, customers transferred no less than $130 million to the Tran Bank Accounts. None of these funds were ever used for legitimate trading purposes, rather, the Receivership Entities misappropriated such funds for their own benefit.

**Transfers to Defendants**

**Christopher Issac Brown**

78. Defendant, Christopher Issac Brown, is a resident of Henderson, Nevada.

79. During the Relevant Period, the Receivership Entities made at least sixteen cryptocurrency transfers to Mr. Brown, for a total of $247,441.97, and Mr. Brown sent the total amount of $2,051.64 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Mr. Brown of $245,390.34 (collectively, the "Brown Transfers"). *See* Schedule of Brown Transfers, attached as **Exhibit B**.

**Joseph Brooks Carter**

80. Defendant, Joseph Brooks Carter, is a resident of Boca Raton, Florida

81. During the Relevant Period, the Receivership Entities made at least nine cryptocurrency transfers to Mr. Carter, for a total of $1,079,212.54, and Mr. Carter sent the total amount of $510,562.02 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Mr. Carter of $568,650.52 (collectively, the "Carter Transfers"). *See* Schedule of Carter Transfers, attached as **Exhibit C**.

**Tomer Daniel**

82. Defendant, Tomer Daniel, is a resident of Tarzana, California.

83. During the Relevant Period, the Receivership Entities made at least four cryptocurrency transfers to Mr. Daniel, for a total of $600,192.13 (the "Daniel Transfers"). *See* Schedule of Daniel Transfers, attached as **Exhibit D**.

**Frank Anthony DiCrisi III**

84. Defendant, Frank Anthony DiCrisi III, is a resident of Costa Mesa, California.

85. During the Relevant Period, the Receivership Entities made at least four cryptocurrency transfers to Mr. DiCrisi for a total of $3,657,655.56, and Mr. DiCrisi sent the total amount of $3,481,764.14 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Mr. DiCrisi of $175,891.42 (collectively, the "DiCrisi Transfers"). *See* Schedule of DiCrisi Transfers, attached as **Exhibit E**.

**Dan Fleyshman**

86. Defendant, Dan Fleyshman, is a resident of Laguna Hills, California.

87. During the Relevant Period, the Receivership Entities made at least thirteen cryptocurrency transfers to Defendant Dan Fleyshman, for a total of $1,994,870.73, and Mr. Fleyshman sent the total amount of $28,000.00 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Mr. Fleyshman of $1,966,870.73 (collectively, the "Fleyshman Transfers"). *See* Schedule of Fleyshman Transfers, attached as **Exhibit F**.

**Amit Fridman**

88. Defendant, Amit Fridman, is a resident of New York, New York.

89. During the Relevant Period, the Receivership Entities made at least one cryptocurrency transfer to Defendant Mr. Fridman, for a total of $520,000.00 (the "Fridman Transfers"). *See* Schedule of Fridman Transfers, attached as **Exhibit G**.

**Julian Kuschner**

90. Defendant, Julian Kuschner, is a resident of Miami, Florida.

91. During the Relevant Period, Mr. Kuschner made at least two transfers of fiat currency to the Receivership Entities for a total of $400,000.00 (the Kuschner Cash Transfers"). *See* Schedule of Kuschner Cash Transfers, attached as **Exhibit H**.

92. Also, during the Relevant Period, the Receivership Entities made at least five cryptocurrency transfers to Mr. Kuschner, for a total of $809,776.66 (the "Kuschner Crypto Transfers"). *See* Schedule of Kuschner Crypto Transfers, attached as **Exhibit I**.

93. The Kuschner Crypto Transfers, together with the Kuschner Cash Transfers, are the "Kuschner Transfers" and amount to a net gain to Mr. Kuschner of $409,776.66.

**Benjamin Muller**

94. Defendant, Benjamin Muller, is a resident of Chattanooga, Tennessee.

95. During the Relevant Period, the Receivership Entities made at least three cryptocurrency transfers to Mr. Muller, for a total of $1,134,900.00, and Mr. Muller sent the total amount of $1,000.00 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Mr. Muller in the amount of $1,133,900.00 (collectively, the "Muller Transfers"). *See* Schedule of Muller Transfers, attached as **Exhibit J**.

**Marco Ruiz Ochoa**

96. Defendant, Marco Ruiz Ochoa, is a resident of Nashua, New Hampshire.

97. During the Relevant Period, Defendant Marco Ruiz Ochoa made at least eleven fiat currency transfers to the Receivership Entities for a total of $337,750.00, and the Receivership Entities made at least nine fiat currency transfers to Ochoa for a total of $304,125.00 for a total net fiat currency loss of $33,625.00 to Ochoa (collectively, the Ochoa Cash Transfers"). *See* Schedule of Ochoa Cash Transfers, attached as **Exhibit K**.

98. Also during the Relevant Period, the Receivership Entities made at least twenty cryptocurrency transfers to Mr. Ochoa, for a total of $839,993.40, and Mr. Ochoa sent the total amount of $489,054.42 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Ochoa of $350,938.98 (collectively, the "Ochoa Crypto Transfers" and, together with the Ochoa Cash Transfers, the "Ochoa Transfers"). *See* Schedule of Ochoa Crypto Transfers, attached as **Exhibit L**.

99. Together through the Ochoa Transfers, Mr. Ochoa received a total combined net gain of $317,313.98.

**Thomas Then**

100. Defendant, Thomas Then, is a resident of Jacksonville Beach, Florida.

101. During the Relevant Period, the Receivership Entities made at least forty-one cryptocurrency transfers to Mr. Then, for a total of $897,477.56, and Mr. Then sent the total amount of $198,681.52 to the Receivership Entities through affiliated cryptocurrency wallet addresses for a total net gain to Mr. Then in the amount of $698,796.04 (collectively, the "Then Transfers"). *See* Schedule of Then Transfers, attached as **Exhibit M**.

**Chad Thyzel**

102. Defendant, Chad Thyzel, is a resident of Murrieta, California.

103. During the Relevant Period, the Receivership Entities made at least six cryptocurrency transfers to Mr. Thyzel, for a total of $938,667.33 (the "Thyzel Transfers"). *See* Schedule of Thyzel Transfers, attached as **Exhibit N**.

**The Collective Transfers**

104. The cryptocurrency and fiat currency transfers identified in paragraphs 78 through 103 above are collectively referred to as the "Transfers."

105. Upon information and belief, each of the Defendants may have engaged in further cryptocurrency transactions with the Receivership Entities, and the Receiver may be able to identify further transfers to one or more of the Defendants.

106. The funds comprising the Transfers to Defendants were funds that the Receivership Entities fraudulently obtained from customers in the form of commissions, fees and/or other payments in connection with the scheme described above.

107. Defendants received the Transfers without providing reasonably equivalent value to the Receivership Entities in exchange for the Transfers.

108. When the Transfers were made to Defendants, the Receivership Entities intended to incur, or believed, or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

109. Thus, the Receivership Entities had the actual intent to delay, hinder, or defraud investors and creditors, and made the Transfers to delay, hinder, or defraud investors and creditors.

110. The Receivership Entities, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the Transfers made to Defendants as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

111. Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, misappropriated, or lost from the Receivership Entities as a result of the fraudulent transfers to, and unjust enrichment of, Defendants.

## CLAIMS FOR RELIEF

### COUNT I
**(Fraudulent Transfer under § 726.105(1)(a), Fla. Stat.
Florida Uniform Fraudulent Transfer Act)**

112. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 111 of this Amended Complaint as if fully set forth herein.

113. This is a claim to avoid and recover a fraudulent transfer pursuant to section 726.105(1)(a), Florida Statutes.

114. As detailed above, the Receivership Entities made the Transfers to the Defendants.

115. Defendants received the Transfers from the Receivership Entities without providing reasonably equivalent value in exchange for the Transfers.

116. At the time that the Receivership Entities made the Transfers, they were operating a fraudulent and/or Ponzi scheme, were insolvent, and were engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

117. When the Receivership Entities made the Transfers to Defendants, the Receivership Entities intended to incur, or believed, or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

118. The Receivership Entities made the Transfers in furtherance of their fraudulent and/or Ponzi scheme.

119. At the time that the Receivership Entities made the Transfers, they removed and/or concealed assets of the Receivership Entities from the reach of their investors and/or creditors.

120. The Receivership Entities made the Transfers at the direction of their principals, as a result of their fraudulent domination, adverse interest in, and control of the Receivership Entities and as part of their continued breaches of their fiduciary duties to the Receivership Entities.

121. The Receivership Entities had the actual intent to delay, hinder, or defraud creditors, and made the Transfers to delay, hinder, or defraud creditors. Consequently, the Transfers were inherently fraudulent pursuant to section 726.105(1)(a), Florida Statutes.

122. Because the Transfers were fraudulent under section 726.105(1)(a), Florida Statutes the Receiver may avoid the Transfers pursuant to section 726.109(2).

123. As a direct and proximate result of the Receivership Entities' fraudulent Transfers to Defendants, the Receivership Estate has been diminished in the amount of the Transfers, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Entities and their principals.

WHEREFORE, Plaintiff, Kelly M. Crawford, as the Receiver, respectfully requests that the Court enter judgment against Defendants: (1) determining that the Transfers from the Receivership Entities to Defendants in the amount of each Transfer were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendants in the full amount of the Transfers received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

**COUNT II**
**(Fraudulent Transfer under §§ 726.105(1)(b) and/or 726.106(1), Fla. Stat., Florida Uniform Fraudulent Transfer Act)**

124. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 111 of this Amended Complaint as if fully set forth herein.

125. This is a claim to avoid and recover a fraudulent transfer pursuant to sections 726.105(1)(b) and/or 726.106(1), Florida Statutes.

126. As detailed above, the Receivership Entities made the Transfers to Defendants.

127. Defendants received the Transfers from the Receivership Entities without providing reasonably equivalent value in exchange for the Transfers.

128. The Receivership Entities did not receive reasonably equivalent value in exchange for the Transfers to Defendants, as detailed above.

129. The Receivership Entities had creditors whose claims arose before they made the Transfers to Defendants.

130. At the time that the Receivership Entities made the Transfers to Defendants, they were insolvent and/or would become insolvent because, post-transfer, their remaining assets were unreasonably small in relation to the business or transaction.

131. The Receivership Entities made the Transfers in furtherance of their fraudulent and/or Ponzi scheme.

132. At the time that the Receivership Entities made the Transfers, they removed and/or concealed assets of the Receivership Entities from the reach of their investors and/or creditors.

133. When the Receivership Entities made the Transfers to Defendants, the Receivership Entities were operating a fraudulent and/or Ponzi scheme and thus intended to incur, or believed,

or reasonably should have believed that they would incur, debts beyond their ability to pay them as they became due.

134. Because the Transfers were voidable under sections 726.105(1)(b) and/or 726.106(1), Florida Statutes, the Receiver may avoid the Transfers pursuant to section 726.109(2).

135. As a direct and proximate result of the Receivership Entities' voidable Transfers to Defendants, the Receivership Estate has been diminished in the amount of the Transfers, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Entities and their principals.

WHEREFORE, Plaintiff, Kelly M. Crawford, as the Receiver, respectfully requests that the Court enter judgment against Defendants: (1) determining that the Transfers from the Receivership Entities to Defendants in the amount of each Transfer were fraudulent and avoiding those Transfers; (2) entering a money judgment against Defendants in the full amount of the Transfers received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

**COUNT III**
**(Unjust Enrichment as to the Transfers)**

136. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 111 of this Amended Complaint as if fully set forth herein.

137. The Receivership Entities conferred a benefit on Defendants when they made the Transfers to Defendants in the amount of the Transfers, all of which were derived from customers of the Receivership Entities' fraudulent scheme. *See* **Exhibit B** through **Exhibit N**.

138. The Defendants had knowledge of the benefit they received from the Receivership Entities as a result of the Transfers and voluntarily accepted and retained the benefit conferred.

139. It is inherently unfair and inequitable that the funds of customers defrauded in the Receivership Entities' fraudulent scheme are retained by and used to personally benefit Defendants, rather than being returned to the Receivership Estate for the benefit of all the defrauded customers.

140. As a direct and proximate result of Defendants' retention of the Transfers they received from the Receivership Entities, the Receivership Estate has been diminished, and, under the circumstances, equity dictates that Defendants should return the funds they received from the Receivership Entities, and any assets they may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors.

WHEREFORE, Plaintiff, Kelly M. Crawford, as Receiver, respectfully requests the Court enter judgment against Defendants: (1) determining that Defendants were unjustly enriched by virtue of their receipt of the Transfers from the Receivership Entities; (2) entering a money judgment against Defendants, in the full amount of the Transfers, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Transfers; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

Respectfully submitted,

*/s/ Russell Landy*

Russell Landy
Florida Bar No. 44417
Email: rlandy@dvllp.com
Vincenzo Lamonica
Florida Bar No. 1058073
Email: vlamonica@dvcattorneys.com
DAMIAN | VALORI | CULMO

*Counsel for Plaintiff, Kelly M. Crawford*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2026, I electronically filed the foregoing document with the clerk of the U.S. District Court, Southern District of Florida, using the electronic case filing system of the court, and the electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record.

*/s/ Russell Landy*
Russell Landy